**UNITED STATES of America,**
**Plaintiff,**

v.

**Charles A. REID, Jr., a/k/a C.A. Reid, Jr. and Charlie Reid, Jr.; Edwina William Charles, a/k/a Edwina Charles; Marcus Anthony Reid; Katrina N. Reid; Anna P. Reid; Suntrust Bank, Augusta, N.A., as successor to FNB of Augusta; Tax Commissioner of Richmond County; and Richmond County, Defendants.**

No. CV196–053.

United States District Court,
S.D. Georgia,
Augusta Division.

Aug. 17, 2000.

Brian P. Kaufman, Trial Atty., Maggie O'Shaughnessy, Philip Doyle, U.S. Department of Justice, Washington, DC, for U.S.

Michael C. Garrett, Garrett & Gilliard, PC, Augusta, GA, for Charles Albert Reid, Jr.,

J. Larry Broyles, Law Offices of J. Larry Broyles, P.C., Augusta, GA, for Charles Albert Reid, Jr., Edwina William Charles, Marcus Anthony Reid, Katrina N. Reid, Anna P. Reid, defendants.

James B. Wall and Lee H., Augusta, GA, for State and County Tax Commission, Richmond County.

## MEMORANDUM OF OPINION AND ORDER

BOWEN, Chief Judge.

Before the Court in the captioned matter are claims tried without a jury on February 22–23, 2000. Plaintiff ("the Government") is seeking to foreclose tax liens in place on property transferred by Defendant Charles A. Reid, Jr. ("Reid") and to set aside certain transfers of real property as fraudulent conveyances. The conveyances at issue are transfers from Reid to his mother and children. As required by Federal Rule of Civil Procedure 52(a), the following findings of fact and conclusions of law are entered in narrative form.

### I. Background

In this case, the parties have made energetic presentations, elaborate preparations, and plausible arguments for each side. The relatively brief trial represented the proverbial "tip of the iceberg" compared to the effort that preceded it. Despite the relatively brief term of the trial, the factual aspects of the case are somewhat complex because they involve eight different parcels of real property, each of which is unique and has been put to a different use by the Reid family. Consequently, each parcel must be treated separately, and the Government's claims to set aside fraudulent transfers thereof must be considered separately against the backdrop of the facts of Reid's life during the periods in question.[1]

The story of this dispute begins with Reid's father, Charles A. Reid, Sr.[2] In his world and day, Reid's father was a puissant figure. He was a property owner, a businessman, and something of a power broker. Reid's father was courted politically and was thought by many to have a substantial voice in the "black vote." Charles Reid, Jr. had an elevated degree of familiarity with "nominee" real estate transactions because that is how he acquired most of his holdings. Reid's father's powerful personality enabled him to manipulate family members and to control a number of properties without regard to actual title. Thus, Charles Reid, Jr. was no stranger to the concept of nominee titles and to the practical aspects of de facto ownership. Reid's father died in 1987, several years after most of the disputed events took place.

According to Reid, the saga began over half a century ago. Reid's father married Pauline Stapleton in 1937. They separated in 1942. That same year, Reid's father married Defendant Edwina Charles ("Edwina Charles"). After Reid's father married Edwina Charles, he filed a divorce petition against Pauline Stapleton. A judgment entered on January 23, 1943 authorized this divorce. Reid was born to Edwina Charles and Charles A. Reid, Sr. in 1944.

In 1947, Edwina Charles filed for divorce against Reid's father. Reid's father

---

1. I caution that not all of this background information is in evidence. Nevertheless, it should be helpful to understand the parties' dispute. Charts summarizing this background information are attached hereto as Court's Exhibit "A." A chronological summary is attached as Court's Exhibit "B."

2. In this Memorandum of Opinion and Order, "Reid" will always refer to Defendant Charles A. Reid, Jr.

was ordered to pay alimony to Edwina Charles. This alimony order was approved by the Georgia Supreme Court in a published opinion, *Reed v. Reed* [sic], 202 Ga. 508, 43 S.E.2d 539 (1947). Edwina Charles moved to New York. Reid continued to live with his father here in Augusta, visiting his mother on occasion. The divorce became final in 1948. Reid claims that his father promised to give his mother some property as part of this divorce. Reid contends that some of the disputed property transfers were intended to satisfy this divorce settlement over thirty years later.

Reid continued to grow up in Augusta. He graduated from Immaculate Conception High School in 1963. In 1966, Reid married his former wife, Defendant Anna P. Reid ("Anna Reid"). (Tr. of Trial on Feb. 22–23, 2000. at 85.) In 1969, they bought some land on Flagler Road in Augusta. (Govt.'s Ex. 156.) Reid initially purchased the entire tract from Pioneers, Inc. and the Georgia Railroad Bank and Trust Company ("Georgia Railroad Bank"). (*Id.*) Reid then conveyed an undivided one-half interest in the Flagler Road land to his wife. (Govt.'s Ex. 157.) Unlike the other properties, Reid's ownership of the Flagler Road residence seemed to be virtually free from his father's controlling influence. (Tr. of Trial on Feb. 22–23, 2000 at 92.)

Shortly after the purchase of the Flagler Road property, Reid's father deeded him ten acres of land, which were subject to two deeds to secure debt. (Govt.'s Ex. 172.) The current street address of this property is 314 Laney Walker Boulevard.[3] These ten acres consist of three individual parcels. Various business have been operated on this land. (Tr. of Trial on Feb. 22–23, 2000 at 182–83.) Reid claims that

the income from these properties went to his father. (*Id.*)

On Christmas Day in 1970, the Internal Revenue Service assessed taxes against Reid's father. In early 1972, Reid acquired two additional parcels of real property. These two parcels comprise a corner lot at the intersection of Sibley Street and Laney Walker Boulevard (formerly Gwinnett Street) in Augusta. (Govt.'s Ex. 190.) At the time, there was a night club on this property. (Tr. of Trial on Feb. 22–23, 2000 at 184.) According to Reid, his father received the income from this nightclub although the property was titled in Reid's name. (*Id.* at 185.) Eight days after its purchase, on February 12, 1972, a tax lien of approximately $111,000 was filed against Reid as a transferee of his father. (*See* Govt.'s Ex. 225, ¶ 70.)

Two children were born to Charles and Anna Reid. Defendant Marcus Reid ("Marcus Reid") was born on August 3, 1972. (Tr. of Trial on Feb. 22–23, 2000 at 101.) Defendant Katrina Reid ("Katrina Reid") was born six years later on December 8, 1978.

On various occasions, Reid conveyed property to his children. On September 25, 1975, another tax lien was filed against Reid as a transferee of his father.[4] Two months later, Reid conveyed his one-half interest in the Flagler Road property to his son, Marcus Reid, reserving a life estate for himself. (Govt.'s Ex. 158.) Further conveyances took place in 1980. The validity of these 1980 conveyances is vigorously disputed.

In 1976, Reid acquired four parcels of land on Laney Walker Boulevard. (Govt.'s Ex. 164.) This purchase may have been arranged by Reid's father. These parcels were used for various business ventures, including a liquor store and a barber shop. (Tr. of Trial on Feb. 22–23, 2000 at 132,

---

3. The correct street address of this property is 314 Laney Walker Boulevard. On occasion, the parties have mistakenly referred to this property as "34 Laney Walker Boulevard." Today, the C.A. Reid, Sr. Memorial Funeral Home is located at 314 Laney Walker Boulevard.

4. There was no documentary evidence of this tax lien introduced during the bench trial.

182.) One week later, on March 12, 1976, a tax lien was filed against Reid as a transferee of his father.[5] Reid then executed a deed to secure debt on the Flagler Road residence in favor of Pilgrim Health and Life Insurance Company ("Pilgrim Life") to secure a debt of $60,000. (Govt.'s Ex. 159.) The purported purpose of this loan was to help Reid's father pay some debts. (Tr. of Trial on Feb. 22–23, 2000 at 99, 133.)

Marital problems emerged around 1978. (*Id.* at 79.) Reid and his wife separated in 1978 pursuant to a written separation agreement. (*Id.;* Def. Reid's Ex. 1.) Reid moved out of the Flagler Road residence but lived there intermittently until 1993. (Tr. of Trial on Feb. 22–23, 2000 at 126.) Reid continued to pay the taxes and the mortgage on the Flagler Road residence. (*Id.* at 81.) His wife paid for the utilities and other upkeep. (*Id.* at 82.) Reid and his wife Anna finally divorced in 1993. (*Id.* at 126.)

Two batches of conveyances are primarily in dispute. Both relate to a bank fraud scheme in which Reid became involved. The first batch of conveyances took place on July 17, 1980, after Reid learned that he was under investigation. The second batch took place on May 8, 1981, after Reid pled guilty.

In 1978, around the time of Katrina's birth, Reid became involved in a bank fraud scheme. During this period, Reid was commuting to mortuary school in Atlanta so that he could learn to operate the family's funeral home business. (*Id.* at 128.) In January 1980, Reid met with some agents of the Federal Bureau of Investigation ("the FBI") and learned that he was under investigation for his participation in the bank fraud. A flurry of conveyances ensued. Reid encumbered part of the ten acre tract on 314 Laney Walker Boulevard with a security deed in favor of First National Bank and Trust Company of Augusta ("First National Bank"), the predecessor in interest to De-

fendant SunTrust Bank, Augusta, N.A. ("Defendant SunTrust"). (Govt.'s Ex. 173.) Reid then conveyed a substantial portion of his real property to his children on July 17, 1980. (Govt.'s Exs. 160, 165, 174, 192, 198.) Reid also purchased a landlocked parcel behind the Flagler Road residence and transferred it to his mother, Edwina Charles. (Govt.'s Exs. 184, 185.) Reid contends that his father directed him to execute these 1980 conveyances. (Tr. of Trial on Feb. 22–23, 2000 at 141.) These 1980 conveyances to Reid's family comprise the first batch of disputed transfers.

The second batch took place approximately one year later. In 1981, Reid was indicted on numerous criminal charges arising from the bank fraud scheme. (Doc. No. 74, Ex. 9.) Three weeks later, Reid pled guilty to counts one and sixteen. This guilty plea initiated a second spate of conveyances. Reid transferred four parcels of property to his mother, Edwina Charles. (Govt.'s Exs. 175, 193, 199, 204.) Again, Reid insists that the properties really belonged to his father. Reid testified that he executed the 1981 conveyances at his father's direction. (Tr. of Trial on Feb. 22–23, 2000 at 147–48.)

Several months after executing these four conveyances, Reid was sentenced to a suspended term of four years in prison and to five years of probation. (Govt.'s Ex. 10.) Reid was ordered to pay a fine of $5,000. (*Id.*) Reid was also ordered to submit to an audit to determine the amount of restitution due the bank. (*Id.*) Reid was to pay restitution upon completion of the audit. (*Id.*) In 1986, Reid was ordered to pay restitution of $25,000. (Def. SunTrust's Ex. 7.)

Around the time of his conviction, Reid's real troubles with the Internal Revenue Service began brewing. In 1981, Reid filed income tax returns for the years 1979 and 1980. (Govt.'s Exs. 53, 54.) When Reid filed for bankruptcy in 1984, (Govt.'s Ex. 125), the Internal Revenue Service

---

**5.** There was no documentary evidence of this tax lien introduced during the bench trial.

claimed that he owed in excess of $300,000 in taxes. (Tr. of Trial on Feb. 22–23, 2000 at 161.) According to Reid, this claim caused the dismissal of his Chapter 13 petition. (*Id.*) In 1985, Reid filed tax returns for the years 1981–1984. (Govt.'s Exs. 55, 56, 57, 58.) As part of an audit, taxes were assessed on this income beginning on March 31, 1986. (*Id.*) The Government also assessed additional taxes on income earned in the years 1979 and 1980. (Govt.'s Exs. 53, 54.)

To collect these taxes assessed in 1986, the Government filed the captioned suit on March 21, 1996.[6] After a two-day trial, a jury found on November 18, 1999 that Reid failed to prove that the assessments made by the Government were incorrect. (Doc. No. 86.) The jury also found that Reid fraudulently concealed income earned in the years 1979 and 1980. (*Id.*)

Statutory tax liens arose on real property held by the Reid family. The Government filed these tax liens in the Clerk's Office of the Superior Court for Richmond County ("the Clerk's Office"). (Ex. A. to Def.'s Mot. to Dismiss, Doc. No. 79, filed on Nov. 12, 1999.) The Government also filed nominee liens against the family members to whom Reid conveyed property. (Exs. B, C, and D to Def.'s Mot. to Dismiss, Doc. No. 79, filed on Nov. 12, 1999.)

The Government's remaining claims were tried in a bench trial held on February 22–23, 2000. This Memorandum of Opinion reports findings of fact and conclusions of law. What is primarily at issue is whether the Government can set aside as fraudulent conveyances the numerous transfers of property mentioned herein.

## II. Conclusions of Law and Applicable Legal Standards

As an initial matter, the Court has subject matter jurisdiction to hear this dispute. 26 U.S.C. § 7402(a); 28 U.S.C.

§§ 1340, 1345. Venue has been properly laid in the Southern District of Georgia because Richmond County, Georgia is the situs of the real property at issue. 28 U.S.C. § 1391(b)(2).

■ The Government seeks to set aside the conveyances under Georgia law. Pursuant to O.C.G.A. § 18–2–22, creditors can set aside:

(1) Every assignment or transfer by a debtor, insolvent at the time, of real or personal property or choses in action of any description to any person, either in trust or for the benefit of or on behalf of creditors, where any trust or benefit is reserved to the assignor or any person for him;

(2) Every conveyance of real or personal estate, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description had or made with intention to delay or defraud creditors, where such intention is known to the taking party; a bona fide transaction on a valuable consideration, where the taking party is without notice or ground for reasonable suspicion of said intent of the debtor, shall be valid; and

(3) Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance.

The Government has the burden of proof. *Owen v. S.P. Richards Paper Co.*, 188 Ga. 258, 263, 3 S.E.2d 660 (1939).

■ Conveyances between family members require special attention. The mere fact of a transfer to a child, *Martin v. Martin*, 180 Ga. 782, 784, 180 S.E. 851 (1935), or to a close relative, *Webb–Crawford Co. v. Bozeman*, 178 Ga. 328, 335, 173 S.E. 144 (1934), does not establish fraud absent other badges of fraud in the evidence. Transactions between close rela-

---

6. The Government's delay in filing and prosecuting this action as well as other potential remedies against Reid has been a source of confusion. The result is that the case seems more complex than necessary.

tives, however, are to be scrutinized closely. *Brown v. Cooper*, 237 Ga.App. 348, 353, 514 S.E.2d 857 (1999). Slight evidence of fraud may be sufficient to set aside a transfer between close relatives, *id.*, and more weight may be given to other badges of fraud, *Bozeman*, 178 Ga. at 335, 173 S.E. 144. The Government argues that the conveyances are voidable under all three subsections of the Georgia statute.[7]

### A. Subsection One

■ To establish its case under § 18–2–22(1), the Government must prove, with respect to each conveyance, by a preponderance of the evidence that:

(1) Reid conveyed real property

(2) while he was insolvent

AND

(3) reserved a trust or benefit for himself in the property so conveyed.

To show that Reid was insolvent, the Government must show by a preponderance of the evidence that, at the time of each conveyance, the value of Reid's remaining property was insufficient to pay his debts. *Goodman v. Lewis*, 247 Ga. 605, 606 n. 1, 277 S.E.2d 908 (1981) (per curiam). The value of the remaining property must be determined as of the date of the conveyance. *Id.* An example of a trust or benefit reserved is the retention by the debtor of a right to live on the property. *Barber v. Terrell*, 54 Ga. 146, 146 (1875).

### B. Subsection Two

To establish its case under § 18–2–22(2), the Government must prove, with respect to each conveyance, by a preponderance of the evidence that:

(1) Reid conveyed property

(2) with the intent to defraud his creditors

AND

(3) that the transferees knew of Reid's intent to defraud his creditors.

*Stokes v. McRae*, 247 Ga. 658, 659, 278 S.E.2d 393 (1981). To establish a case under this subsection, the Government does not have to show that Reid was insolvent. *Anderson Oil Co. v. Benton Oil Co., Inc.*, 246 Ga. 304, 305, 271 S.E.2d 207 (1980).

■ Fraudulent intent is usually proved by circumstantial evidence. The Government must set forth facts and circumstances from which the trier of fact can infer fraudulent intent on Reid's part. *Nicol & Davidson v. Crittenden*, 55 Ga. 497, 497 (1875). Transactions between family members are to be carefully scrutinized, although the mere fact that there is a conveyance between family members is, by itself, insufficient to support a finding of fraud. *Martin*, 180 Ga. at 784, 180 S.E. 851. If Reid sold land and retained possession of the land after the sale, there is prima facie evidence of fraud. *State Banking Co. v. Miller*, 185 Ga. 653, 655, 196 S.E. 47 (1938). If the Government establishes a prima facie case of fraudulent intent, the burden of proof shifts to Reid to establish that the transfers of property were made in good faith. *Duncan v. First Nat'l Bank of Cartersville, Ga.*, 597 F.2d

---

7. The Government has advanced two other theories of recovery. First, the Government argues that the transferees hold the property in a constructive trust for Reid pursuant to O.C.G.A. § 53–12–93. Courts can ignore a sham transaction and impose a constructive trust. *E.g., United States v. Williams*, 581 F.Supp. 756, 758–59 (N.D.Ga.1982). Second, the Government argues that under federal law, it can subject the property to Reid's tax liabilities if it shows that the transferees were mere "nominees" or "alter egos" of Reid. *E.g., G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); *Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 728 (11th Cir.1989).

These additional theories of recovery are cumulative and unnecessary. The factual findings and legal conclusions would be the same if these additional theories of recovery were used. In the interest of simplicity and economy, the disputed transfers will be analyzed only under the Georgia fraudulent conveyance statute.

51, 56 (5th Cir.1979).[8] Reid can rebut a prima facie case if he offers an explanation of the circumstances. *E.g., Scruggs v. Blackshear Mfg. Co.,* 45 Ga.App. 855, 858, 166 S.E. 249 (1932) (holding that proof of the payment of valuable consideration rebuts the presumption arising from the seller's continued possession of the property sold). Inadequacy of consideration is another relevant factor. *United States v. McMahan,* 392 F.Supp. 1159, 1166 (N.D.Ga.1975), *rev'd on other grounds,* 569 F.2d 889 (5th Cir.1978) (en banc).

■ The Government must also prove that the transferees had either actual or constructive knowledge of Reid's fraudulent intent. *Stokes,* 247 Ga. at 659, 278 S.E.2d 393. A transferee has constructive knowledge of fraud if he is put on notice to suggest further inquiry into the transferor's fraudulent intent. *Nelson v. United States,* 821 F.Supp. 1496, 1503 (M.D.Ga. 1993). One case holds that "[k]nowledge of possible criminal conduct by the transferor puts the transferee on notice of the former's possible fraudulent intentions." *Federal Deposit Ins. Corp. v. United States,* 654 F.Supp. 794, 813 (N.D.Ga.1986).

■ I conclude as a matter of law that to show that a child had constructive knowledge, the Government must show that a reasonable *person* would have grounds for suspicion. *Nelson,* 821 F.Supp. at 1503 (referring to a reasonable person standard). The fraudulent conveyance statute, after all, must be liberally construed. *Duncan v. Freeman,* 152 Ga. 332, 332, 110 S.E. 5 (1921). To hold Reid's children merely to the standard of a "reasonable child" would entirely defeat the salutary, remedial purpose of the fraudulent conveyance statute.

8. The Eleventh Circuit adopted as binding precedent all Fifth Circuit cases decided before September 30, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

9. The statute refers to "voluntary deed[s] or conveyance[s], not for a valuable consider-

## C. Subsection Three

■ To establish its case under § 18-2-22(3), the Government must prove, with respect to each conveyance, by a preponderance of the evidence that:

(1) Reid transferred property

(2) without consideration [9]

(3) while he was insolvent.

Under this third subsection, the Government does not have to show any fraudulent intent. *Mercantile Nat'l Bank v. Aldridge,* 233 Ga. 318, 320–21, 210 S.E.2d 791 (1974).

■ To show that Reid transferred property without consideration, the Government must show by a preponderance of the evidence that the transfer was not "founded on money, or something convertible into money, or having a value in money." *Stokes,* 247 Ga. at 659, 278 S.E.2d 393. If Reid received any money, even a dollar, the conveyances would not be facially invalid, although the Government could prove that the consideration was inadequate. *Pharr v. Pharr,* 206 Ga. 354, 357, 57 S.E.2d 177 (1950). Whether consideration is so inadequate as to render the conveyance fraudulent depends on the intention of the parties and on the facts and circumstances surrounding the conveyance. *Id.* An example of consideration that is facially inadequate is a conveyance only for "love and affection." *Bussell v. Glenn,* 197 Ga. 816, 818, 30 S.E.2d 617 (1944). As under subsection one, proving insolvency requires the Government to prove that the value of Reid's remaining property was insufficient to pay all of his debts in full. *Goodman,* 247 Ga. at 606 n. 1, 277 S.E.2d 908.

ation." O.C.G.A. § 18-2-22(3). The phrase "not for a valuable consideration" simply defines the word "voluntary." To say that a conveyance or deed is "voluntary" is to say that it was transferred for no consideration. *McDonald v. Taylor,* 200 Ga. 445, 449, 37 S.E.2d 336 (1946).

## III. Findings of Fact

There are numerous parcels of real property at issue. The parties have divided them into eight pieces of property and have referred to them as such. For the purpose of discussing these transfers, it will be easier to treat them chronologically. Conveyances took place on six different occasions:

1) conveyances and acquisitions prior to 1975;

2) 1975 conveyance to Marcus Reid;

3) 1976 mortgage and acquisitions;

4) 1980 conveyances coinciding with the FBI investigation into Reid's bank fraud;

5) 1981 conveyances following Reid's guilty plea; and

6) 1982 conveyance by Edwina Charles.

The factual findings with respect to each of these six periods are set forth below.[10]

### A. Conveyances and Acquisitions Prior to 1975

Reid acquired most of the property at issue before 1975.[11] In 1969, Reid purchased the land on which the family home sits. Reid also deeded an undivided one-half interest in this land to Anna Reid. Later in that same year, Reid acquired a ten acre tract of land which is known today as 314 Laney Walker Boulevard. In 1972, Reid acquired two parcels comprising a corner lot at the intersection of Sibley Street and Laney Walker Boulevard.

#### 1. 1969 Conveyances and Acquisitions

On March 1, 1969, Reid purchased some land on Flagler Road. The Flagler Road residence is the family home in which Charles Reid, Anna Reid, Marcus Reid, and Katrina Reid have lived. It is located in the Belair Hills subdivision of Augusta. (Tr. of Trial on Feb. 22–23, 2000 at 95.) Anna, Marcus, and Katrina Reid continue to live there today. (*Id.* at 78, 101–02, 198.) Mentioned in Count One of the Government's Complaint, the Flagler Road residence is what the parties have called "Property Number One." The Flagler Road residence and the wooded lot behind it are the only properties in which Reid's father played no role.

On March 26, 1969, Pioneers, Inc. and Georgia Railroad Bank executed a warranty deed which conveyed the Flagler Road land to Reid.[12] (Govt.'s Ex. 156.) The consideration recited is ten dollars. (*Id.*) This warranty deed transferred two parcels of unimproved land. The house was not built until 1972, with the land serving as collateral for the construction loan. (Tr. of Trial on Feb. 22–23, 2000 at 80.)

Later in the year, on November 28, 1969, Reid conveyed an undivided one-half interest to his wife.[13] (Govt.'s Ex. 157.) Anna Reid's explanation of this conveyance was that "that's what married people do, they hold it half and half." (Tr. of Trial on Feb. 22–23, 2000 at 80.) The consideration for this transfer was "love and affection." (Govt.'s Ex. 157.) Reid conveyed the property subject to a deed to secure debt in favor of Georgia Railroad Bank.

The Government has not sought to set aside these 1969 conveyances. (*See* Compl. ¶¶ 9–17; Proposed Findings of Fact and Conclusions of Law by United States ¶¶ 21–39, Doc. No. 78, filed on November 9, 1999.) Moreover, these conveyances seem regular. Anna Reid testified logical-

---

10. The record from which these factual findings are drawn includes the testimony and evidence admitted at the bench trial on February 22–23, 2000 as well as the testimony and evidence admitted at the jury trial on November 16–18, 1999. (*See* Tr. of Trial on Feb. 22–23, 2000 at 34.)

11. The only properties acquired after 1975 are the parcels known as 950–960 Laney Walker Boulevard and the 1.66 acre landlocked parcel behind the family home.

12. This warranty deed is recorded in the Clerk's Office in Realty Book 36J on pages 778–79.

13. This deed is recorded in the Clerk's Office in Realty Book 37E on pages 550–51.

ly and credibly that her husband conveyed an undivided one-half interest to her so that they could jointly hold title to the property. (Tr. of Trial on Feb. 22–23, 2000 at 80.) Typically, this is what married people do. There is no reason to set aside the 1969 conveyance to Anna Reid.

Also in 1969, Reid's father deeded him ten acres of land on Laney Walker Boulevard.[14] These ten acres consist of three separate parcels. All three parcels were conveyed on September 4, 1969, six months after Reid bought the land on Flagler Road. (Govt.'s Ex. 172.) The recited consideration is ten dollars. (*Id.*) The land was conveyed subject to two encumbrances. One was a security deed in favor of Georgia Railroad Bank, securing a debt of which $47,000 was then unpaid. (*Id.*) The other was a security deed in favor of W.F. Barton, securing a debt of which $10,000 was then unpaid. (*Id.*) Mentioned in Counts Three, Four, and Eight of the Complaint, these three parcels are what the parties have called "Property Number Three," "Property Number Four," and "Property Number Eight."

The Reids have operated various businesses thereon. At one point, there were some rental apartments. (Tr. of Trial on Feb. 22–23, 2000 at 182.) These apartments were vacated in the 1970s. (*Id.*) A bowling alley was also there. (*Id.* at 183.) On October 26, 1979, Reid leased a two acre parcel to Opportunities Investment Associates, Inc. ("OIA").[15] (Govt.'s Ex. 203A.) OIA operated a casket manufacturing business on the leased two acre parcel.[16] (*Id.*) Reid testified that his father

received the income from all of these business ventures. (Tr. of Trial on Feb. 22–23, 2000 at 182–83.) In or around 1990, the Reids built a funeral home on part of this ten acre tract. (*Id.* at 57, 112.)

### 2. 1972 Acquisition of the Corner Lot

On February 4, 1972, Reid bought two parcels of land at the intersection of Laney Walker Boulevard and Sibley Street. These two parcels comprise a corner lot. Reid purchased the corner lot from Frankie W. Dockins, the executrix of the estate of Clayton M. Dockins. (Govt.'s Ex. 190.) The property was transferred by warranty deed, and the consideration recited is ten dollars.[17] (*Id.*) On the same day, the property was encumbered by a deed to secure debt in favor of Frankie W. Dockins. (Govt.'s Ex. 191.) The deed secured a debt of $23,000. (*Id.*) The Reids operated a night club here until the early 1980s. (Tr. of Trial on Feb. 22–23, 2000 at 184–85.) According to Reid, his father received the income from the night club and made the payments on the note to Frankie M. Dockins. (*Id.* at 134, 185.) Mentioned in Counts Six and Seven of the Government's Complaint, the parties have referred to this corner lot as "Property Number Six" and "Property Number Seven."

### B. 1975 Conveyance to Marcus

The first of the disputed transactions took place in 1975. On November 10, 1975, Reid conveyed to his son Marcus a remainder in his undivided one-half interest in the Flagler Road home.[18] (Govt.'s

**14.** This deed is recorded in the Clerk's Office in Realty Book 36–X, pages 457–58.

**15.** This lease is recorded in the Clerk's Office on Realty Reel No. 127, pages 1910–13.

**16.** The parties have referred to this two acre parcel as "Property Number Eight."

**17.** This warranty deed is recorded in the Clerk's Office on Realty Reel No. 1, pages 1936 and 1937.
 There are two parcels which comprise the corner lot. The warranty deed transferring

the parcel on 842 Sibley Street is Government's Exhibit 190. The warranty deed transferring the other parcel appears to be missing from the record. It should appear on Realty Reel No. 1, pages 1938 and 1939. (*See* Govt.'s Ex. 193.) Pages 1938 and 1939 are nowhere to be found. There is no dispute, however, that Reid purchased the two parcels in February 1972.

**18.** This deed is recorded in the Clerk's Office on Realty Reel No. 54, pages 974–75.

Ex. 158.) This conveyance was subject to a deed to secure debt in favor of Georgia Railroad Bank. (*Id.*) The consideration recited is "love and affection." (*Id.*) This conveyance left Reid with a life estate in an undivided one-half interest in the house and lot. Unlike the 1969 conveyance to Anna Reid, this is not what family members typically do.

At the time of the conveyance, Marcus Reid was three years old. (*See* Tr. of Trial on Feb. 22–23, 2000 at 101.) Obviously, Marcus Reid could not have been aware of the conveyance. In fact, Marcus Reid was not aware of this property interest until 1982, at the earliest. (*Id.* at 104.) Interestingly, Anna Reid was also unaware of the 1975 conveyance to Marcus Reid. (*Id.* at 81.) Marcus Reid has not paid any taxes, received any rents, taken out any loans, or exercised any other indicia of ownership with respect to the Flagler Road residence. (*Id.* at 104.) Instead, Reid has made all the mortgage and tax payments. (*Id.* at 81.)

This 1975 conveyance to Marcus Reid is most unusual and highly questionable. It becomes especially so in light of subsequent fraudulent conveyances in 1980 and 1981. This 1975 conveyance is best understood as part of a pattern of fraudulent conveyances from Reid to his immediate family members.[19] Considering the unusual and furtive nature of this conveyance, the inadequate consideration, and Reid's subsequent fraudulent transactions, I conclude that Reid acted with fraudulent intent when he conveyed this interest to Marcus.

 There is no evidence, however, that Marcus Reid had knowledge of Reid's fraudulent intent. At the age of three, Marcus Reid could not have had actual knowledge of his father's fraudulent intent.

The Government presented few, if any, indicia of fraud that would have put a reasonable person on constructive notice of Reid's fraudulent intent at the time of the conveyance. This conveyance was mentioned only in passing during the cross-examination of Anna Reid. (*Id.* at 80–81.) Information about this conveyance is conspicuously absent from the testimony of Charles Reid and Marcus Reid. There is no specific evidence from which to conclude that Reid was insolvent after the conveyance. Given the dearth of information, the Government has not carried its burden of proving that the 1975 conveyance to Marcus was fraudulent.

### C. 1976 Mortgage and Acquisitions

Two relevant transactions took place in 1976. Reid mortgaged the Flagler Road residence and acquired some additional parcels of land on Laney Walker Boulevard.

#### 1. 1976 Mortgage

On May 14, 1976, Reid and his wife mortgaged the Flagler Road property to help Reid's father pay some delinquent property taxes. (*Id.* at 132.) In furtherance thereof, Reid and his wife executed a deed to secure debt in favor of Pilgrim Life.[20] (Govt.'s Ex. 159.) The debt secured was $60,000. (*Id.*) Reid testified that he satisfied this $60,000 mortgage. (Tr. of Trial on Feb. 22–23, 2000 at 133.) The mortgage was not satisfied until 1986. (*Id.* at 150.) This mortgage is not disputed in these proceedings.

#### 2. Land Comprising 950–960 Laney Walker Boulevard

On May 5, 1976, Reid bought four parcels of land from Nelson Williams of Mil-

---

**19.** Also, there is some suggestion by way of argument that the Government filed a tax lien against Reid as his father's transferee on September 25, 1975, just two months before the conveyance to Marcus. I prefer to draw factual conclusions from the testimony of the witnesses and the plain language of the documentary evidence.

**20.** This deed is recorded in the Clerk's Office on Realty Reel No. 60, pages 2154–56.

waukee, Wisconsin.[21] (Govt.'s Ex. 164.) These four parcels are numbered in Augusta as 950, 952, 958, and 960 Laney Walker Boulevard.[22] Mentioned in Count Two of the Government's Complaint, this property is what the parties have called "Property Number Two." The consideration recited in the deed is ten dollars. (*Id.*) In addition to paying ten dollars, Reid also agreed to pay the taxes and other debts due on the property. (*Id.*) Nelson Williams had earlier become indebted to Reid when Reid remodeled and repaired the property. Reid agreed to cancel this indebtedness as part of the consideration for the conveyance. (*Id.*)

The Reids used this property for family businesses. On or near this property, the Reids operated a liquor store called the "Paramount." (Tr. of Trial on Feb. 22–23, 2000 at 151–53.) At one point, there was a barber shop from which Reid's father received rents. (*Id.* at 182.)

### D. 1980 Conveyances Coinciding with the FBI Investigation

In or around January 1980, Reid met with some agents from the FBI. (*Id.* at 136.) Reid learned that he was under investigation for bank fraud. (*Id.* at 137.) Shortly thereafter, Reid executed a batch of quitclaim deeds to his children. These conveyances are at the center of this dispute. Reid simultaneously transferred his interest in the Flagler Road residence, in the parcels comprising 950–960 Laney Walker Boulevard, in the corner lot, and in most of the ten acre tract to Marcus and

Katrina. Later in the year, Reid purchased a wooded lot behind the Flagler Road residence and immediately transferred it to his mother, Edwina Charles. Reid explained that he executed most of these 1980 conveyances at his father's direction. (*Id.* at 141.) The Flagler Road residence merits separate treatment, as there is no evidence that Reid's father influenced any of the Flagler Road conveyances. (*Id.* at 92.)

This batch of conveyances rendered Reid insolvent. Reid owed money, although the exact amount and when the debts arose are not clear from the record. Earlier in the year, on March 26, 1980, Reid borrowed $8,000 from First National Bank. (*Id.* at 136.) The note is now in default. (*Id.* at 154.) Although the promissory note is in Reid's name, (Def. Sun-Trust's Ex. 1), Reid testified that his father made the payments on the note, (Tr. of Trial on Feb. 22–23, 2000 at 154). At some point either before or around the time of the bank fraud investigation, Reid became indebted to Richmond County as a result of a bail bonding business he once operated. (*Id.* at 164–69.) The amount of this debt may have been as high as $35,000. (*Id.* at 168.) Reid admitted that the first batch of conveyances in July 1980 left him with no assets. (*Id.* at 141.) After Reid executed these 1980 conveyances, he was unable to pay his debts in full.[23]

### 1. Flagler Road Residence

As part of the batch of conveyances on July 17, 1980, Reid quitclaimed his interest

**21.** This deed is recorded in the Clerk's Office on Realty Reel No. 60, pages 2159–2160. There is evidence outside the record that one week after this purchase, on March 12, 1976, a tax lien was filed against Reid as a transferee of his father.

In a conveyance not at issue in this dispute, Nelson Williams quitclaimed his interest in this same property to Anna Reid. (Govt.'s Ex. 166.) This quitclaim conveyance was the subject of litigation in the Richmond County Superior Court in the late 1980s. It was set aside after a jury determined that it was a fraudulent conveyance. (Govt.'s Ex. 167.)

Nelson Williams is Reid's half-brother. (Govt.'s Ex. 225, ¶ 52.)

**22.** At the time, it was called "Gwinnett Street."

**23.** Because the conveyances rendered Reid insolvent, they can be set aside upon a showing that the consideration received was inadequate or that Reid retained an interest in the property so conveyed. O.C.G.A. § 18–2–22(1) and (3).

in the Flagler Road residence to his children.[24] (Govt.'s Ex. 160.) The consideration was ten dollars and love and affection. (*Id.*) Anna Reid insisted that her husband transferred his interest in the Flagler Road property to insure that she and the children would have a place to live in the event of a divorce. (Tr. of Trial on Feb. 22–23, 2000 at 83.) Marcus was about eight years old, and Katrina was only one and one half years old.[25] This conveyance merits consideration apart from the others because Reid's father had no hand in it. (*Id.* at 92.)

■ The July 17, 1980 conveyance of Reid's interest in the Flagler Road residence was a fraudulent conveyance. It is voidable under all three subsections of the Georgia fraudulent conveyance statute. First, it is voidable under subsection one because Reid transferred property while insolvent, retaining a benefit for himself. Even though Reid held no ownership interest, he continued to live intermittently at the Flagler Road residence. (*Id.* at 126.) The 1978 separation agreement explicitly gave him use and possession of the Flagler Road residence. (Def. Reid's Ex. 1, ¶ 4.) Because he retained the right to live at the Flagler Road residence, Reid retained a benefit for himself as contemplated by O.C.G.A. § 18–2–22(1). *Barber,* 54 Ga. at 146. The conveyance is therefore voidable under O.C.G.A. § 18–2–22(1).

The conveyance was also fraudulent under subsection two. Reid's fraudulent intent can be inferred from the pendency of the criminal investigation and from the fact that he fraudulently concealed income from the Internal Revenue Service. Another fact evidencing Reid's fraudulent intent is the inadequate consideration. The stated consideration was only ten dollars and love and affection. (Govt.'s Ex. 160.)

This consideration is far below the value of this residential property.

The most telling evidence of Reid's fraudulent intent comes from the circumstances surrounding the transaction. Shortly after Reid learned that he was under investigation for bank fraud, he conveyed numerous parcels of real property to his young children. All these conveyances took place on the same day. Reid purged himself of his real property in an effort to shield it from his creditors. From this disgorgement, Reid's fraudulent intent is especially discernible.

The investigation into Reid's criminal conduct would put a reasonable person on notice of his fraudulent intent. Also, the conveyance of valuable residential property to small children for negligible consideration should arouse the suspicion of a reasonable person. Marcus and Katrina Reid therefore had constructive notice of their father's fraudulent intent.

Anna Reid claimed that the purpose of the conveyance was to protect the interests of the children in the event of a divorce. (Tr. of Trial on Feb. 22–23, 2000 at 83.) This explanation is not credible. The 1978 separation agreement left the title of the residence intact. (Def. Reid's Ex. 1, ¶ 4.) Anna Reid had at least an undivided one-half interest in the Flagler Road residence. (Govt.'s Ex. 157.) Anna Reid therefore had the right to exact rent from Reid if she and the children had moved out. Also, the separation agreement provided—somewhat ambiguously—that:

> [i]n the event the residence is ever sold, one half (½) of the net proceeds from the sale shall be distributed to the Wife and children equally.

---

**24.** This deed is recorded in the Clerk's Office on Realty Reel No. 128, pages 1975–76.

**25.** By virtue of this transaction, the children received disparate interests. The 1975 conveyance to Marcus left Reid with only a life estate in an undivided one-half interest in the Flagler Road residence. This was the interest Reid conveyed to his children. A merger of interests held by Marcus yielded a one-half undivided interest in the Flagler Road residence subject to Katrina's right to a one-fourth estate for the life of Reid.

(Def. Reid's Ex. 1, ¶4.) The 1978 separation agreement protected the interests of Anna Reid, Marcus Reid, and Katrina Reid. Inter vivos transfers are acceptable in some contexts, but this transfer strongly suggests fraud. The preponderance of the evidence shows that the conveyance was fraudulent. It is therefore voidable under O.C.G.A. § 18–2–22(2).

Finally, the conveyance is also voidable under subsection three. As explained earlier, Reid was insolvent after he conveyed his interest to his children. The consideration for the transfer was only ten dollars, which was inadequate. Because Reid transferred property for inadequate consideration while insolvent, the conveyance was fraudulent. It is therefore voidable under O.C.G.A. § 18–2–22(3).

### 2. Parcels Comprising 950–960 Laney Walker Boulevard

By quitclaim deed, Reid transferred his interest in 950–960 Laney Walker Boulevard to Marcus Reid.[26] (Govt.'s Ex. 165.) The consideration recited is ten dollars and love and affection. (*Id.*)

■ As explained earlier, Reid acted with fraudulent intent when he executed the batch of conveyances on July 17, 1980. Marcus Reid had constructive knowledge of his father's intent. The conveyance of commercial property to a seven or eight year old child for nominal consideration would, under the circumstances, arouse the suspicion of a reasonable person. Further, Marcus Reid gave no credible explanation of the transfer. At trial, he testified vaguely that it was "put in my name for the future." (Tr. of Trial on Feb. 22–23, 2000 at 109.) Marcus Reid has never paid any property taxes and never received any income from the Paramount. (*Id.* at 107.)

At trial, Reid offered two explanations for this conveyance to Marcus. The first explanation offered at trial is that it was necessary to put the property known as 950–960 Laney Walker Boulevard in Marcus Reid's name in order to obtain the $60,000 mortgage on the Flagler Road residence from Pilgrim Life. In 1976, when the Flagler Road residence was mortgaged to Pilgrim Life, Marcus Reid owned a remainder in Reid's undivided one-half interest. According to Reid, a probate judge ruled that Marcus Reid's interest could not be mortgaged unless Marcus received some consideration in return. (*Id.* at 150–51.) Reid gave no other information about the probate judge's ruling. Reid introduced no other supporting evidence.

This explanation is not satisfactory. The property on 950–960 Laney Walker Boulevard was not put in Marcus Reid's name until July 1980, four years after the Reids took out the 1976 mortgage. Transferring the parcels comprising 950–960 Laney Walker Boulevard is better understood as a part of the first batch of fraudulent conveyances executed on July 17, 1980. I cannot accept the explanation of this conveyance as a satisfaction of a four-year old debt to Marcus Reid.

The second and primary explanation offered at trial is that Reid's father was the real owner of the properties and that Reid transferred them at his father's direction. (*Id.* at 141.) Reid claimed that he merely signed the deeds brought to him by his father. (*Id.* at 144.) Reid testified that it would have been unacceptable to contravene his father's instructions. (*Id.* at 186.)

Reid testified that all his financial matters were controlled by his father. Reid's father paid his tuition to mortuary school and gave him a car. (*Id.* at 129, 130.) Reid said that his father helped him pay his bills. (*Id.* at 130.) According to Reid, his father made payments on the $8,000 promissory note to First National Bank. (*Id.* at 154.) Reid's father apparently received all the income produced by the four

---

**26.** On July 30, 1980, this deed was recorded in the Clerk's Office on Realty Reel No. 128, pages 1977–78. No interest therein was transferred to Katrina Reid.

parcels on Laney Walker Boulevard. (*Id.* at 182.)

Reid's explanation is somewhat credible. It tends to undercut the Government's claim that he acted of his own volition. Nevertheless, it is of no avail.

The fraud of the Flagler Road conveyance taints the other conveyances of the same day. It is undisputed that the Flagler Road residence belonged exclusively to Reid and that his father had no hand in the conveyances thereof. (*Id.* at 92.) It is inconsistent for Reid to argue that some of the transfers were not fraudulent because they were executed at his father's direction while Reid on the same day fraudulently transferred property that was free of his father's interference. All of the conveyances of July 17, 1980 constituted a divestment in bulk designed to thwart Reid's potential creditors.

Further, Reid's simple acquiescence in his father's scheme to place properties beyond the reach of either's creditors is nothing more or less than Reid's adoption of his father's purpose as his own. Thus, the father's intent is imputed to Reid.[27]

The preponderance of the evidence shows that Reid acted with fraudulent intent when he conveyed the land comprising 950–960 Laney Walker Boulevard to Marcus Reid. Marcus Reid had constructive knowledge of his father's fraudulent intent. The conveyance was therefore fraudulent under O.C.G.A. § 18-2-22(2).

The conveyance was also fraudulent under O.C.G.A. § 18-2-22(3). As explained earlier, Reid was insolvent after the conveyances of July 17, 1980. Because the consideration received was inadequate, the conveyance was fraudulent. The conveyance is therefore voidable under O.C.G.A. § 18-2-22(3).

### 3. The Corner Lot

Also as part of the batch of conveyances executed on July 17, 1980, Reid quitclaimed his interest in the two parcels comprising the lot at the corner of Laney Walker Boulevard and Sibley Street. Reid executed two quitclaim deeds. (Govt.'s Exs. 192, 198.) The first conveyed the parcel on 842 Sibley Street to Marcus and Katrina Reid. (Govt.'s Ex. 198.) The other conveyed the parcel on 7 Laney Walker Boulevard to Marcus and Katrina Reid. (Govt's Ex. 192.) Reid thereby conveyed the entire corner lot to both of his children. The consideration recited in each deed is ten dollars and love and affection. (Govt.'s Exs. 192, 198.) The deed transferring the parcel on 842 Sibley Street was promptly recorded, but the deed transferring the parcel on 7 Laney Walker Boulevard was not recorded until June 29, 1982.[28] (Govt.'s Ex. 192.)

Reid acted with fraudulent intent when he conveyed the corner lot to his children. This conclusion requires little explanation. The circumstances surrounding these conveyances are like the circumstances surrounding the conveyances already discussed. Marcus Reid testified that he is not familiar with the corner lot even though it is titled in his name. (Tr. of Trial on Feb. 22–23, 2000 at 120.) Marcus Reid never paid any property taxes on the corner lot and never received any income from the night club there. (*Id.*) Katrina Reid did not even know that the properties were titled in her name. (*Id.* at 200.) Also, Reid conveyed this commercial property on which a business was operating to his minor children. The consideration received was negligible and inadequate. All these facts support the conclusion that

---

27. The interference of Reid's father bears only on whether Reid acted with fraudulent intent. Under subsection three of the fraudulent conveyance statute, Reid's intent is irrelevant. *Aldridge*, 233 Ga. at 320–21, 210 S.E.2d 791. Regardless of Reid's intent, the conveyances of July 17, 1980 were fraudulent because Reid

transferred property for insufficient consideration while insolvent. O.C.G.A. § 18-2-22(3).

28. The first quitclaim deed is recorded in the Clerk's Office on Realty Reel No. 128, pages 1971–72. The other is recorded on Realty Reel No. 151, pages 2545 and 2546.

Reid's intent was fraudulent. These circumstances gave Reid's children constructive notice of their father's fraudulent intent.

■ Because Reid acted with fraudulent intent of which his children had constructive notice, the conveyances of the corner lot were fraudulent. They were also fraudulent because Reid transferred them for inadequate consideration while insolvent. Accordingly, the conveyances are voidable under O.C.G.A. § 18–2–22(2) and (3).

### 4. Ten Acre Tract on Laney Walker Boulevard

The ten acre tract of land was involved in several conveyances associated with Reid's criminal troubles. First, when Reid executed the $8,000 promissory note to First National Bank on March 26, 1980, he encumbered a 1.5 acre parcel of this ten acre tract. (Govt.'s Ex. 173.) Along with all the other transfers on July 17, 1980, Reid quitclaimed his interest in most of the ten acre tract to his children. (Govt.'s Ex. 174.) Reid excepted from this conveyance the two acre parcel, which was still under lease to the casket company, OIA.[29] (*Id.*) The consideration for the conveyance was ten dollars and love and affection. (*Id.*) This quitclaim deed was not recorded until June 29, 1982.[30]

As explained earlier, Reid acted with fraudulent intent when he quitclaimed part of his interest in the ten acre tract. Reid's children had constructive notice of his fraudulent intent. The nominal nature of the recited consideration is obviously inadequate, under the circumstances, for the interest transferred. In all these respects,

this conveyance is virtually the same as the other conveyances of July 17, 1980. The conveyance is therefore voidable under O.C.G.A. § 18–2–22(2) and (3).

### 5. Wooded Lot Behind Flagler Road

There remains one more disputed 1980 conveyance. Soon after the first batch of conveyances to his children, Reid transferred some property to his mother. This property is a landlocked 1.66 acre parcel behind the Flagler Road Residence. According to Edwina Charles, the property lies on a slope. (Tr. of Trial on Feb. 22–23, 2000 at 63.) This 1.66 acre parcel remains unimproved today. (*Id.* at 184.) Mentioned in Count Five of the Government's Complaint, this wooded lot is what the parties have called "Property Number Five."

On October 21, 1980, Pioneers, Inc. transferred this 1.66 acre wooded lot by warranty deed to Reid for $4,500.[31] (Govt.'s Ex. 184.) That very same day, Reid conveyed the 1.66 acre wooded lot to his mother by warranty deed.[32] (Govt.'s Ex. 185.) The only consideration recited is "love and affection." (*Id.*) Reid claimed that Edwina Charles gave him the money to buy the property on her behalf. (Tr. of Trial on Feb. 22–23, 2000 at 145.) At the time, Edwina Charles may have been living in New York. (*Id.* at 77; *see* Govt.'s Ex. 226, ¶ 6.) According to Reid, Edwina Charles wanted to buy the 1.66 acre wooded lot so that she might have a place to live near her family. (Tr. of Trial on Feb. 22–23, 2000 at 146.) Edwina Charles eventually encumbered this property with a deed to secure debt in favor of Richmond County.[33] (Govt.'s Ex. 186.)

---

29. Reid thus conveyed what the parties have called "Property Number Three" and "Property Number Four."

30. This quitclaim deed is recorded in the Clerk's Office on Realty Reel No. 151, pages 2547–48.

31. This warranty deed is recorded in the Clerk's Office on Realty Reel No. 132, pages 774–776.

32. This warranty deed is recorded in the Clerk's Office on Realty Reel No. 133, page 1672.

33. This deed is recorded in the Clerk's Office on Realty Reel No. 187, pages 2510–14. This

Edwina Charles, however, contradicted Reid's explanation. She testified that Reid gave the 1.66 acre wooded lot to her as a gift. (Tr. of Trial on Feb. 22–23, 2000 at 63.) Edwina Charles made clear that she never paid any money for this property. (*Id.* at 64.) Edwina Charles still does not use the 1.66 acre wooded lot even though she moved to Augusta in 1993. (*Id.* at 76.) Reid's explanation of this transaction is illogical and disingenuous.

Reid acted with fraudulent intent when he conveyed this 1.66 acre wooded lot to his mother. As explained earlier, Reid's fraudulent intent can be inferred from the pendency of the criminal investigation and the concealment of his income taxes. Edwina Charles testified that she had no knowledge of Reid's financial problems or of the pending criminal investigation. (*Id.* at 51–52, 62.) In fact, Edwina Charles claimed that she did not know about her son's 1981 bank fraud conviction until the jury trial in November 1999—eighteen years later. (*Id.* at 52.) Nevertheless, Edwina Charles had constructive if not actual knowledge of her son's fraudulent intent.

Edwina Charles's claim of ignorance is not credible. Throughout her testimony, Edwina Charles gave answers that were indirect and confusing, if not altogether evasive. (*E.g., id.* at 53, 57, 58, 59, 62, 65–66, 70.) Edwina Charles could not explain the reasons for one of her own conveyances. (*Id.* at 65–66.) Edwina Charles knew of Charles Reid, Sr.'s financial problems and of the suspicious nature of his businesses. It is highly unlikely given the terms of her son's probation and its concomitant limitations that Edwina Charles did not know about his bank fraud conviction until last year. In all likelihood, Edwina Charles had actual knowledge of her son's fraudulent intent when she received the 1.66 acre wooded lot.

██ Even if Edwina Charles did not have actual knowledge, she had constructive knowledge. Edwina Charles knew that Charles Reid, Sr. engaged in dealings that were suspicious and unusual. (*Id.* at 52.) She knew or should have known about his debts to the Internal Revenue Service. She may have transferred property at his insistence. (*Id.* at 60, 62, 65.) Edwina Charles had every reason to understand that transfers of property among her family might represent an attempt to evade creditors. This conveyance involved a transfer of property between close family members for no consideration. Under these circumstances, a reasonable person would have been on notice of Reid's fraudulent intent. Therefore, the conveyance of the 1.66 acre wooded lot was a fraudulent conveyance that is voidable under O.C.G.A. § 18–2–22(2).

██ The conveyance is also voidable under subsection three. Reid admitted that he had no assets after he conveyed the 1.66 acre wooded lot. (Tr. of Trial on Feb. 22–23, 2000 at 141.) Reid had no way of satisfying the $8,000 promissory note executed on March 26, 1980 in favor of First National Bank. (Def. SunTrust's Ex. 1.) Reid was therefore insolvent after the conveyance. Also, because the recited consideration is only "love and affection," (Govt.'s Ex. 185), the consideration is facially inadequate. The conveyance is therefore fraudulent under O.C.G.A. § 18–2–22(3).

### E. 1981 Conveyances Following Reid's Guilty Plea

The next batch of disputed conveyances took place in 1981. On February 19, 1981, Reid was indicted on various charges of bank fraud. (Court's Ex. 3, admitted on Nov. 18, 1999.) Reid pled not guilty on March 3, 1981. Eight days later, Reid

deed also encumbered Edwina Charles's interest in the corner lot and in the ten acre

tract on Laney Walker Boulevard.

pled guilty to two counts.[34] On August 28, 1981, Reid was sentenced to serve a suspended sentence of four years in prison and was placed on probation for five years. (Govt.'s Ex. 10.) Reid was fined $5,000. (*Id.*) Reid was also ordered to pay restitution to the bank. (*Id.*) To determine the amount of restitution, Reid was ordered to cooperate in an audit. (*Id.*)

On May 8, 1981—shortly after Reid pled guilty, he executed four warranty deeds to his mother, Edwina Charles. These warranty deeds conveyed interests in the corner lot and the ten acre tract on Laney Walker Boulevard. Edwina Charles eventually encumbered these properties with a deed in favor of Richmond County to secure a debt of $35,400.50.[35] (Govt.'s Ex. 186.)

Two warranty deeds conveyed the parcels comprising the corner lot.[36] (Govt.'s Exs. 193, 199.) The consideration recited in each is one dollar and love and affection. (*Id.*) Reid had already quitclaimed his interest to his children in the 1980 conveyances. These two warranty deeds to Edwina Charles were recorded before some of the quitclaim deeds to the children were recorded.

The other two warranty deeds conveyed part of the ten acre tract on Laney Walker Boulevard. One conveyed a 1.5 acre parcel of the ten acre tract.[37] (Govt.'s Ex. 175.) According to the parties, the second warranty deed conveyed Reid's interest in only the two acre parcel (what the parties have called "Property Number Eight") on which OIA operated the casket business.[38]

■ Reid acted with fraudulent intent when he executed the four warranty deeds of May 8, 1981. Reid knew or should have known that his guilty plea would eventually require him to make restitution to the bank. Sensing that his commercial property might be exposed to potential creditors, Reid conveyed this commercial property to his mother for negligible consideration. Just as he did the previous year during the pendency of the FBI investigation, Reid conveyed a batch of properties. From these circumstances, I find that Reid acted with fraudulent intent.[39]

---

**34.** A record of Reid's guilty plea is not in evidence.

**35.** This security deed is recorded in the Clerk's Office on Realty Reel No. 187, pages 2510–14. This deed also encumbered Edwina Charles's interest in the 1.66 acre wooded lot behind the Flagler Road residence.

**36.** The first warranty deed is recorded in the Clerk's Office on Realty Reel No. 138, page 1601. The second is recorded in the Clerk's Office on Realty Reel No. 138, page 1602. These two deeds were recorded on May 11, 1981. Of the deeds transferring the corner lot to the children on July 17, 1980, one was not recorded until June 29, 1982. (Govt.'s Ex. 192.)

**37.** This warranty deed is recorded in the Clerk's Office on Realty Reel No. 138, page 1600.

**38.** This warranty deed is recorded in the Clerk's Office on Realty Reel No. 138, page 1603. The deed actually appears to convey Reid's interest in the entire parcel. By its terms, the deed conveyed:

> ALL that lot or parcel of land, with improvements thereon, situate lying and being in the state of Georgia County of Richmond located in the [illegible] G.M.D. as shown on a plat prepared by Franklin A. Toole, registered land surveyor, dated June 18, 1980 copy of said plat is incorporated herein and attacked [sic] as part of for a more complete and accurate description of the metes, bounds, counsed [sic] distances and location of said property.

(Govt.'s Ex. 204.) The other warranty deed, by contrast, made clear that only 1.5 acres were conveyed. (*See* Govt.'s Ex. 175.) For present purposes, it is unimportant exactly what property was conveyed.

**39.** In various pretrial documents, Reid insisted that his father ordered him to transfer properties to his mother as a belated satisfaction of their divorce settlement. Little or no evidence was introduced to substantiate this claim. For example, when asked why his father directed him to convey properties to his mother, Reid said, "I had no idea." (Tr. of Trial on Feb. 22–23, 2000 at 148.)

Edwina Charles had either constructive or actual notice of Reid's fraudulent intent. As explained earlier, Edwina Charles knew of her former husband's questionable dealings. Under the circumstances, she had reason to believe that the conveyances might be an attempt by her son to shield property from his creditors. Also, the negligible consideration should have aroused her suspicion. Accordingly, I find as a fact that Edwina Charles had constructive knowledge of Reid's fraudulent intent.

The batch of conveyances executed on May 8, 1981 consisted entirely of conveyances that were fraudulent under O.C.G.A. § 18–2–22(2). Accordingly, the four warranty deeds of May 8, 1981 are voidable.

### F. 1982 Conveyance by Edwina Charles

In the second batch of fraudulent conveyances on May 8, 1981, Reid conveyed to Edwina Charles a 1.5 acre parcel of the ten acre tract. (Govt.'s Ex. 175.) The parties have referred to this 1.5 acre parcel as "Property Number Three." On July 23, 1982, Edwina Charles quitclaimed her interest in this 1.5 acre parcel to Marcus and Katrina Reid.[40] (Govt.'s Ex. 176.) This conveyance took place approximately three weeks after the Reids belatedly recorded one of the 1980 conveyances to Marcus and Katrina. At the time of this 1982 conveyance, Marcus was almost ten years old, and Katrina was three and one half years old. The consideration recited is love and affection and one dollar. (Id.)

■ The Government has not carried its burden of proving that this 1982 conveyance was fraudulent. Edwina Charles's testimony was confused and had little probative value. At one point, Edwina Charles suggested that she executed this 1982 conveyance at the behest of Reid and her former husband. (Tr. of Trial on Feb. 22–23, 2000 at 65.) In response to another question, she insisted that she

conveyed the property as a gift to her grandchildren. (Id. at 62.) In response to a third question, she said that there was "[n]o particular reason" that she transferred the property to her grandchildren. (Id. at 65–66.) It is not unlikely that Edwina Charles acted merely as the alter ego of her son and her former husband. Nevertheless, there is insufficient evidence from which to conclude that Edwina Charles acted with fraudulent intent. Also, there is no evidence that Edwina Charles was insolvent at the time. Accordingly, this 1982 conveyance will not be set aside.

### IV. Disposition of Property and Further Conclusions of Law

■ There remains to be considered the effect of these findings of fact. Fraudulent conveyances are voidable in respect of creditors. Title remains in the debtor subject to subsequent judgments in favor of his creditors. *Coleman v. Law*, 170 Ga. 906, 910, 154 S.E. 445 (1930). Accordingly, all the conveyances of July 17, 1980 and May 8, 1981 will be voided as against the Government. Except for the Flagler Road residence and the 1.5 acre parcel of the ten acre tract, title to all the properties at issue remains in Reid's name. Subject to any valid liens or other encumbrances, Reid holds the following properties in fee simple:

1) the four parcels acquired from Nelson Williams on May 5, 1976, (Govt.'s Ex. 164), numbered in Augusta as 950, 952, 958, and 960 Laney Walker Boulevard ("Property Number Two");

2) the ten acre parcel of land acquired from Charles Reid, Sr. on September 4, 1969, (Govt.'s Ex. 172), numbered in Augusta as 314 Laney Walker Boulevard, excepting the 1.5 acre parcel quitclaimed by Edwina

---

**40.** This quitclaim deed is recorded in the Clerk's Office on Realty Reel No. 153, pages 1769–70.

Charles to Marcus Reid on July 23, 1982 (Reid therefore holds fee simple title to "Property Number Four" and "Property Number Eight");

3) the 1.66 acre wooded lot behind the Flagler Road residence, purchased on October 21, 1980, (Govt.'s Ex. 184) ("Property Number Five"); and

4) the corner lot acquired from Frankie W. Dockins on February 4, 1972, (Govt.'s Ex. 190), which consists of two parcels numbered in Augusta as 7 Laney Walker Boulevard and 842 Sibley Street ("Property Number Six" and "Property Number Seven").

Thus, the Government can foreclose the liens on the properties listed above to satisfy Reid's tax liabilities. 26 U.S.C. § 6335. Proceeds from any foreclosure sales are subject to prior security interests. 26 U.S.C. § 6323. The status of the 1.5 acre parcel and the Flagler Road residence requires further analysis.

### A. The 1.5 Acre Parcel Conveyed by Edwina Charles in 1982

The ten acre tract on Laney Walker Boulevard consists of three parcels. On July 17, 1980, in the first batch of fraudulent conveyances, Reid quitclaimed his interest to Marcus and Katrina. (Govt.'s Ex. 174.) Reid excepted from this conveyance a two acre parcel which was still under lease to OIA. (*Id.*) On May 8, 1981, in the second batch of fraudulent conveyances, Reid conveyed a 1.5 acre parcel of the ten acre tract to Edwina Charles. (Govt.'s Ex. 175.) As explained earlier, these conveyances were fraudulent and will be set aside.

On July 23, 1982, Edwina Charles quitclaimed her interest in this 1.5 acre parcel to Marcus and Katrina Reid. (Govt.'s Ex. 176.) The Government has not shown that this 1982 conveyance was fraudulent. To determine who owns the 1.5 acre parcel, it

must be determined whether a grantee on notice of the grantor's fraudulent intent can subsequently transfer the property received to a third party.

Where a grantor executes a fraudulent conveyance, the grantee holds the property in a constructive trust for the creditors of the grantor. *Edwards v. United Food Brokers*, 195 Ga. 1, 7, 22 S.E.2d 812 (1942). The grantor's creditors can compel the grantee to account for his disposition of the fraudulently conveyed property. *Id.* This statement implies that the grantee of a fraudulent conveyance can convey an interest in the fraudulently transferred property. Reid's creditors can compel Edwina Charles to account for her disposition of the 1.5 acre parcel. A judgment setting aside the conveyance to Edwina Charles will not, however, affect any interest received by Marcus and Katrina Reid in the 1.5 acre parcel.

### B. The Flagler Road Residence

Reid, his wife, and his son all own disparate interests in the Flagler Road residence. The interests of the Reid family in and to the Flagler Road residence is as follows:

1) Anna Reid owns an undivided one-half interest;

2) Reid owns a life estate in an undivided one-half interest subject to the rights of Anna Reid under the separation agreement of November 22, 1978, (Def. Reid's Ex. 1), and subject to the rights of Anna Reid as a party in possession; and

3) Marcus Reid owns a remainder subject to the rights of Anna Reid.

The federal tax liens filed against Reid attach only to the property interests that Reid holds.[41] *United States v. Rodgers*, 461 U.S. 677, 690–91, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983). When the Govern-

---

41. Liens can be filed against the "nominees" or "alter egos" of a delinquent taxpayer. *E.g., Winebrenner v. United States*, 924 F.2d 851, 853 (9th Cir.1991.) Nominee liens have been filed against Marcus Reid, Katrina Reid, and Edwina Charles. There is no evidence that nominee liens have been filed against Anna Reid.

ment seeks to order the sale of property held in part by a delinquent taxpayer and in part by innocent third parties, the court has discretion to grant or deny the Government's request. *Id.* at 706, 103 S.Ct. 2132. At least four factors should guide the exercise of this discretion:

1) the prejudice to the Government's financial interests;

2) whether the third parties would have a legally recognized expectation that their property interest would not be subject to a foreclosure sale;

3) the likely prejudice to the third parties; and

4) the relative character and value of the non-liable and liable interests held in the property.

*Id.* at 710–11, 103 S.Ct. 2132.

### 1. *Prejudice to the Government's Financial Interests*

Denying a foreclosure sale as to this property would render the Government's tardy effort to collect Reid's taxes only marginally less effective. Admittedly, the Flagler Road residence may be the most valuable property at issue in this case, but Reid's interest in it is essentially theoretical, not practical.

Three factors weigh against prejudice to the Government. First, any foreclosure proceeds would be subject to other interests. These interests might include exempt property, 26 U.S.C. § 6334, and any liens in favor of the Richmond County Defendants, 26 U.S.C. § 6323; *see* Order of March 13, 2000 at 13, 2000 WL 641611 at *6. These other interests decrease the cost to the Government of denying a foreclosure sale.

Second, the Government is partially to blame for the confusion. After assessing taxes on Reid in 1986, the Government waited until 1996 to bring this action. Delays persisted. The case came to trial only after ·Reid filed a motion to dismiss the case for want of prosecution. During the intervening fourteen years, the likelihood

of collecting Reid's indebtedness has presumably declined because of the Government's own conduct.

Third, the potential for prejudice to Anna Reid and Marcus Reid far exceeds any resulting prejudice to the Government. The Government claims that Reid's tax liability is almost $500,000. (Supp. Aff. of Caroline Lanasa ¶ 4, attached to Doc. No. 101, filed on Feb. 18, 2000.) The value of the Flagler Road residence is not in evidence. Anna Reid testified that it is in a state of disrepair. (Tr. of Trial on Feb. 22–23, 2000 at 96–97.) Even if the Government levied on Reid's interest in the Flagler Road residence, which is subject to exemptions, prior security interests, and the rights of parties in possession, any proceeds would satisfy only a tiny fraction of Reid's tax liability, which may be as great as $500,000. What Anna Reid and her children stand to lose is not insignificant. They stand to incur moving expenses and to lose the sentimental value of their family home. Their share of any foreclosure proceeds at a forced sale would never compensate them for the interests they presently hold, imperfect as they may be.

### 2. *Expectations of the Third Parties*

██ Anna Reid has a legally recognized expectation that her interest would not be subject to Reid's debts. As previously held, the 1969 conveyance from Reid to his wife was not fraudulent. As a result, they hold separate ownership interests in the Flagler Road residence. Georgia law provides that the property of each spouse is separate property. O.C.G.A. § 19-3-9. Creditors can reach a third-party spouse's property where there has been a fraudulent conveyance. *E.g., Mattox v. West,* 194 Ga. 310, 316, 21 S.E.2d 428 (1942). Otherwise, the separate property of a spouse is not subject to the levy of the delinquent spouse's creditors. *See id.* at 311, 21 S.E.2d 428 (mentioning the wife's claim filed against a levy on property in her husband's possession). Anna Reid

also has an interest in the statutory homestead exemption. O.C.G.A. § 44–13–2. The settled property interests and rightful expectations of Anna Reid weigh against a foreclosure sale.

### 3. Likely Prejudice to the Third Parties

Upon a foreclosure sale, Anna Reid and Marcus Reid would receive compensation for their interests in the Flagler Road residence. 26 U.S.C. § 7403(c). "[F]inancial compensation may not always be a completely adequate substitute for a roof over one's head." *Rodgers,* 461 U.S. at 704, 103 S.Ct. 2132. For example, this compensation would not include the expense of moving and securing a new residence, which is an example of prejudice. *Id.* at 711, 103 S.Ct. 2132. Furthermore, it would not include the sentimental value of the home in which the children have grown up. If Anna Reid had to find a new home, she might have to pay taxes and insurance which had heretofore been paid by her husband. (Tr. of Trial on Feb. 22–23, 2000 at 180; Def. Reid's Ex. 1, ¶ 4.)

There is little or no evidence that Anna Reid was a party to Reid's fraud and delinquency. Of note, the Flagler Road transactions appear somewhat regular. In 1969, Anna Reid received an undivided one-half interest in the Flagler Road residence. The purpose of this conveyance was to provide for joint ownership of the residence. (Tr. of Trial on Feb. 22–23, 2000 at 80.) After their separation in 1978, Reid continued to pay the taxes and the mortgage pursuant to the separation agreement. (*Id.* at 180.) This separation agreement became part of the divorce decree. (*Id.*) Reid might have been held in contempt of court had he stopped making these payments. These arrangements appear more like a regular allocation of property pursuant to a marital dissolution than an attempt to evade creditors. A foreclosure sale would punish Anna Reid, Marcus Reid, and Katrina Reid, who are comparatively innocent third parties. Moreover, there is no question that a Government foreclosure sale against real estate subject to such a mixed bundle of property interests would result in the most minimal of bids. There is little likelihood of the confirmation of such a sale.

### 4. Relative Value of Reid's Interest

Anna Reid and Marcus Reid hold interests which, combined, are far greater than Reid's interest. Reid holds only a life estate in an undivided one-half interest. Marcus Reid holds a remainder in an undivided one-half interest, and Anna Reid holds an undivided one-half fee simple interest in the property. This comparison weighs against a foreclosure sale.

Also, Reid's interest may be of insignificant value. It is subject to Anna Reid's rights under the 1978 separation agreement and to her rights as a party in possession. Even if Reid's interest has value, any determination of the extent thereof would be extraordinarily difficult and largely theoretical. Anna Reid's interest is far from theoretical; it is a practical necessity.

▪ Accordingly, I conclude that the effort to foreclose against the Flagler Road property is an exercise in formalism. The home might be sold but with little, if any, value to the Government and with great detriment to the owners of other interests. Therefore, I decline to disturb the present balance of interests, such as they are.

### V. Production of a Final Judgment

A final judgment will be issued as soon as practicable. The parties are encouraged to discuss and agree upon a form for the final judgment. The parties may at any time before the close of business on Friday, September 8, 2000 submit a proposed final judgment, reserving all rights. For such purposes, the parties should assume the validity of the jury verdict of November 18, 1999 and the Court's findings of fact and conclusions of law without

prejudice to any position they may later take. The submission of a proposed final judgment will not be construed as a waiver of any rights to challenge the jury's verdict or the Court's findings of fact and conclusions of law.

Any proposed final judgment should include the amount of any money judgment entered in favor of the Government and the per diem interest rate. Any proposed final judgment should also make clear whether it is appropriate to enter judgment on Reid's tax liabilities arising from income earned in any year other than 1979 or 1980.

This judgment should determine the priority of all liens on the properties at issue. 26 U.S.C. § 7403(c). Defendant SunTrust has submitted evidence of its interest in a 1.5 acre parcel of the ten acre tract ("Property Number Three"). In their response to the Order of December 2, 1999, Defendants Richmond County and Tax Commissioner of Richmond County ("the Richmond County Defendants") averred generally that they have first priority liens arising from delinquent property taxes. For the purpose of entering a final judgment, the Richmond County Defendants are hereby **ORDERED** to file a supplemental brief. This supplemental brief need not be lengthy, but must be filed with the Clerk's Office by the close of business on Friday, September 1, 2000. This supplemental brief should include:

1) the amount of Reid's indebtedness to the Richmond County Defendants;

2) the source of this indebtedness; and

3) certified copies of any properly filed liens in place on the properties at issue.

This information is necessary to fulfill the Court's obligation under 26 U.S.C. § 7403(c).

In summary, the following conveyances are hereby set aside:

1) the quitclaim deed of July 17, 1980 from Charlie Reid, Jr. to Marcus and Katrina Reid purporting to convey Charlie Reid Jr.'s interest in the residence numbered in Augusta as 1536 Flagler Road, (Govt.'s Ex. 160), and recorded in the Clerk's Office on Realty Reel No. 128, pages 1975–76;

2) the quitclaim deed of July 17, 1980 from Charlie A. Reid, Jr. to Marcus Reid purporting to convey Charlie A. Reid Jr.'s interest in the parcels numbered in Augusta as 950, 952, 958, and 960 Laney Walker Boulevard, (Govt.'s Ex. 165), and recorded in the Clerk's Office on Realty Reel No. 128, pages 1977–78;

3) the quitclaim deed of July 17, 1980 from C.A. Reid, Jr. to Marcus and Katrina Reid purporting to convey C.A. Reid, Jr.'s interest in the parcel numbered in Augusta as 7 Laney Walker Boulevard, (Govt.'s Ex. 192), and recorded in the Clerk's Office on Realty Reel No. 151, pages 2545–46;

4) the quitclaim deed of July 17, 1980 from C.A. Reid, Jr. to Marcus and Katrina Reid purporting to convey C.A. Reid, Jr.'s interest in the parcel numbered in Augusta as 842 Sibley Street, (Govt.'s Ex. 198), and recorded in the Clerk's Office on Realty Reel No. 128, pages 1971–72;

5) the quitclaim deed of July 17, 1980 from Charlie Reid, Jr. to Marcus and Katrina Reid purporting to convey all but two acres of a ten acre tract of land on Laney Walker Boulevard, (Govt.'s Ex. 174), and recorded in the Clerk's Office on Realty Reel No. 151, pages 2547–48;

6) the warranty deed of October 21, 1980 from Charlie Reid, Jr. to Edwina Charles purporting to convey Charlie Reid, Jr.'s interest in a 1.66 acre parcel behind the residence numbered in Augusta as 1536 Flagler Road, (Govt.'s Ex. 185), and recorded in the Clerk's Office on Realty Reel No. 133, page 1672;

7) the warranty deed of May 8, 1981 from Charlie Reid, Jr. to Edwina

Charles purporting to convey Charlie Reid, Jr.'s interest in the parcel numbered in Augusta as 7 Laney Walker Boulevard, (Govt.'s Ex. 193), and recorded in the Clerk's Office on Realty Reel No. 138, page 1601;

8) the warranty deed of May 8, 1981 from Charlie Reid, Jr. to Edwina Charles purporting to convey Charlie Reid, Jr.'s interest in the parcel numbered in Augusta as 842 Sibley Street, (Govt.'s Ex. 199), and recorded in the Clerk's Office on Realty Reel No. 138, page 1602;

9) the warranty deed of May 8, 1981 from Charlie Reid, Jr. to Edwina Charles purporting to convey Charlie Reid, Jr.'s interest in a 1.5 acre parcel of a ten acre tract on Laney Walker Boulevard, (Govt.'s Ex. 175), and recorded in the Clerk's Office on Realty Reel No. 138, page 1600; and

10) the warranty deed of May 8, 1981 from Charlie Reid, Jr. to Edwina Charles purporting to convey Char-

lie Reid, Jr.'s interest in all or part of a ten acre tract on Laney Walker Boulevard, (Govt.'s Ex. 204), and recorded in the Clerk's Office on Realty Reel No. 138, page 1603.

## VI. Conclusion

In accordance with Federal Rule of Civil Procedure 52(a), the foregoing findings of facts and conclusions of law are hereby entered. In the final judgment, all of the conveyances executed by Reid on or about July 17, 1980 and May 8, 1981 will be set aside. No other conveyance will be invalidated. The Richmond County Defendants are ordered to file a supplemental brief as provided herein.